MGD

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Oscar Martinez-Salgado, | No. CV 17-04312-PHX-DGC (CDB) |
| Plaintiff, | |
| v. | **ORDER** |
| Rico Suffle, et al., | |
| Defendants. | |

Plaintiff Oscar Martinez-Salgado, who was formerly confined in the La Paz County Adult Detention Facility (the "Jail"), brought this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1.) Defendant Jail Commander Suffle – the only remaining Defendant in this case – moves for summary judgment, and Plaintiff opposes.[1] (Docs. 34, 35.) The Court will grant the Motion and terminate this action.

**I.  Background**

Count One alleges the following: Plaintiff was in the Jail dayroom when another detainee, Garcia, became upset that Defendant Suffle would not speak to him and was ordered to lock down several times, but did not do as told. (Doc. 1 at 5.) Defendant then entered the dayroom, started firing pepper balls at everyone in sight and yelled for everyone to lock down. (*Id.*) All the detainees tried to calm Defendant down, telling him "there's no need for all that" and that all he had to do was speak to Garcia. (*Id.*) As Plaintiff was

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) regarding the requirements of a response. (Doc. 37.)

closing his cell door, he felt a pepper ball hit his foot. (*Id.*) The detainees were stuck in their cells all night "gagging, coughing, crying, eyes burning, and noses running" and they were not allowed to clean their rooms afterward. (*Id.*) As a result, Plaintiff alleges that he suffered PTSD, anxiety, stress, tension, night terrors, anger, frustration, paranoia, schizophrenia, depression, suicidal thoughts, fear of further abuse, pain, suffering, and trust issues. (*Id.*) Plaintiff seeks damages. (*Id.* at 14.)

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an excessive force claim in Count One and directed Defendant Suffle to answer. (Doc. 5.) The Court dismissed the remaining claims and Defendants. (*Id.*) Defendant moves for summary judgment on the basis that the force used was objectively reasonable and he is entitled to qualified immunity.

**II.      Legal Standards**

      **A.      Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its

favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### B. Excessive Force

A pretrial detainee has a right under the Due Process Clause of the Fourteenth Amendment to be free from punishment prior to an adjudication of guilt. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). A pretrial detainee may therefore allege a cause of action under the Due Process Clause where conditions of confinement, such as food, clothing, shelter, medical care, and personal safety, "amount to punishment." *Bell*, 441 U.S. at 535; *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). Conditions amount to punishment when: (1) the conditions result in a sufficiently serious denial of the minimum standard of care, and (2) the official's actions or omissions with respect to the conditions are objectively unreasonable, such that it can be inferred that those conditions are imposed for the purpose of punishment. *Kingsley v. Hendrickson*, ___ U.S. ___, 135 S.Ct. 2466, 2473 (2015); *Bell*, 441 U.S. at 538; *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070-71 (9th Cir. 2016).

Whether an officer's actions were objectively unreasonable is determined "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 135 S.Ct. at 2473. Whether the conditions and conduct rise to the level of a constitutional violation is an objective assessment that turns on the "facts and circumstances of each particular case." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). In determining whether the use of force

was reasonable, a court should consider factors including, but not limited to, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id*. at 2473.

### III. Facts

On August 22, 2017, Plaintiff was incarcerated in a maximum-security pod at the Jail where he was awaiting trial. (Doc. 35 (Def.'s Statement of Facts) ¶¶ 1-2.) That day, Plaintiff was exercising outside his cell when detainee Garcia was told to lockdown. (*Id.* ¶ 4.) The Jail's lockdown procedure requires that detainees who are out in the pod return to their cells and close the doors, which automatically lock. (*Id.* ¶ 5.) Video footage shows that for at least 15 to 20 minutes Garcia had been climbing on the door and repeatedly struck the glass with his fist, foot and head and made aggressive gestures through the window. (*Id.* ¶¶ 7, 10.) The control tower gave multiple commands for Garcia to lockdown and Garcia refused to comply. (*Id.* ¶¶ 11-12.)

The control tower then used the intercom to order the entire pod into lockdown. The order was given multiple times and included use-of-force warnings if detainees failed to comply with the lockdown commands. (*Id.* ¶ 13.) The lockdown commands are given before officers enter a pod because it is safer for everyone if detainees comply and return to their cells to de-escalate a potentially violent disturbance, especially since the number of detainees usually outnumbers the Jail staff. (*Id.* ¶ 14.) On the day of the incident, the detainee-to-officer ratio in Plaintiff's pod was 15 to 1. (*Id.* ¶ 3.) Although Plaintiff claims he did not hear the general lockdown order until Defendant entered the pod, video footage shows that all detainees in Plaintiff's pod, including Plaintiff, were heading toward their cells before Defendant entered the pod. (*Id* ¶¶ 15-16.)

Before entering the pod, Defendant perceived that Garcia's behavior was disruptive to the pod, was escalating in violence, and was a threat to security within the maximum-security pod. (*Id.* ¶ 18.) The fact that other detainees, including Plaintiff, had not locked

down as commanded, was further evidence that the disturbance was escalating beyond Garcia. (*Id.*) About 15 minutes after Garcia's "aggressive and disruptive behavior" started, Defendant, along with Detention Officer McIntosh and Corporal Fleming, entered the pod and repeated the lockdown command. (*Id.*) Defendant clearly displayed a PepperBall launcher when he entered the pod and warned detainees to lock down, but several detainees still refused and remained unsecured, and Defendant "reasonably perceived these acts of defiance as an escalating threat."[2] (*Id.*) Defendant entered the pod to attempt to restore order and to de-escalate the threat of violence. (*Id.* ¶ 19.)

Many of the detainees complied with the lockdown order and locked themselves in their cells. (*Id.* ¶ 24.) Plaintiff knew he was supposed to lock down, that he was supposed to follow Jail staff orders, and that maintaining security is important for Jail officials. (*Id.* ¶¶ 23, 25.) Plaintiff refused to close his cell door and chose to stand in the doorway of his cell. (*Id.* ¶ 26.)

After giving multiple verbal warnings, Defendant saw that Plaintiff and 4 other detainees had not locked down—two detainees were on the upper balcony (Fuentes and Ping), and Plaintiff and Garcia were on the floor level with their cell doors fully open. (*Id.* ¶ 27.) Another detainee, Carter, was also outside of his cell, but he was showering on the main level of the pod near Plaintiff's cell when the incident unfolded. (*Id.*) Garcia handed something to Plaintiff, which Defendant perceived as a threat to the safety of himself and other officers. (*Id.*) As he gave verbal warnings, Defendant displayed the PepperBall launcher. (*Id.*) Fuentes eventually complied with the lockdown orders, but the other detainees still refused to lockdown and remained unsecured, and Defendant "perceived

---

[2] A PepperBall launcher "discharges frangible rounds (projectiles) that open and release powdered chemicals upon impact." (Doc. 35 ¶ 20.) According to Defendant, PepperBall rounds are less potent than being directly sprayed with liquid pepper spray and that the most intense effects of direct exposure to pepper spray resolve in about 20 minutes and residual effects can last an hour or two at most. (*Id.* ¶ 21.) The advantage of a PepperBall launcher is that Jail staff can launch the rounds from a safe distance without being within inches of disruptive detainees. (*Id.* ¶ 22.)

these acts of defiance as an escalating threat to not only the officers inside the pod but also to the other [detainees] within the pod." (*Id*.) Because Plaintiff, Garcia and Ping continued to disobey the lockdown orders, Defendant determined that the use of PepperBall warning rounds were necessary to get the detainees to comply with the orders. (*Id*.)

Defendant first launched PepperBall rounds at the upper balcony area, where Ping was outside of his cell, but Defendant did not aim the PepperBall rounds at any of the detainees. (*Id*.) The frangible rounds disintegrated upon impact and released the powdered pepper chemical. (*Id*.) Defendant then learned that Ping's cell door was locked, preventing Ping from locking down, and Ping was ordered to get on the ground. (*Id*.) During this time, Plaintiff's and Garcia's cell doors were still fully open "and Plaintiff continued talking back to Commander Suffle and the other officers ordering him to lockdown." (*Id*.) Defendant then aimed the PepperBall launcher in Plaintiff's direction, and Plaintiff and Garcia "feigned locking down," but Plaintiff left his door halfway open and Garcia stuck his head out of his cell. (*Id*.) Because Defendant believed that Plaintiff and Garcia were in the process of locking down, he returned his attention to Ping, who had not yet complied with orders to get on the ground. Ping ultimately complied after Defendant again displayed the PepperBall launcher and ordered him to lie on the ground. (*Id*.)

Plaintiff continued to refuse to lockdown as commanded and stood inside his half-closed cell door "in what appeared to Commander Suffle to be a purposeful act of disobedience," and Garcia's cell door, which was next to Plaintiff's, slowly began opening. (*Id.* ¶ 28.) Defendant then launched two warning PepperBall rounds 3 to 5 feet away from Plaintiff's and Garcia's cell doors, after which Garcia closed his door to lockdown and Carter, who had been showering, went upstairs to his cell. (*Id*.) Plaintiff, though, did not lock down and instead began to protest, saying, "Hey, man, stop. You don't have to do that." (*Id*.) Plaintiff left the cell door ajar as he continued his protest, but then finally locked down. (*Id*.)

The PepperBalls did not strike Plaintiff's body or inside his cell, but hit the ground 3 to 5 feet in front of Plaintiff's cell. (*Id.* ¶ 29.) The PepperBalls hit the ground and the

powdered chemical released several feet away from Plaintiff, who was behind his cell door and in the process of closing it. (*Id.*) Video footage shows that Plaintiff was not hit in the foot by the PepperBall launcher. (*Id.* ¶ 31.) Even if Plaintiff had been hit on the foot, he admitted there was no bruising or swelling or persistent rash or irritation afterward, and he did not seek any medical treatment for his foot or anything related to deployment of the PepperBall. (*Id.* ¶¶ 32-34.) Although Plaintiff claims he suffered a burning sensation from the PepperBall chemicals for two days, symptoms from "direct exposure to pepper spray can last for only two hours at most," and Plaintiff did not come into direct contact with pepper spray. (*Id.* ¶ 35.) Despite Plaintiff's claim that he suffered PTSD, paranoia, and schizophrenia, he has not received such diagnoses from a doctor. (*Id.* ¶¶ 36-37.)

The Jail has a ventilation system that is used to remove any lingering PepperBall chemicals so that they do not continue to permeate the pod, and the ventilation system was used that day after the PepperBalls were launched. (*Id.* ¶ 38.) Officers turned the vents on to remove any lingering pepper spray from the pod after the incident, and Corporal Ruiz directed detainee workers to get the cleaning carts and clean up any remaining chemical residue, which they did. (*Id.* ¶¶ 39-40.) Plaintiff had access to running water in his cell if he needed to rinse off. (*Id.* ¶ 41.)

Plaintiff disputes there was any threat of danger necessitating the use of PepperBalls, asserting that Jail staff were used to Garcia's behavior and did not consider him a threat and that Defendant provoked the incident with Garcia. (Doc. 39 at 2, citing Docs. 34-35, 38 and Exhibits 4, 6.)[3] Plaintiff also claims that Defendants never turned on the ventilation system in the pod and no clean up of the "hazmat" material took place for 24 hours, but Plaintiff does not cite any evidence in support of this claim. (*See id.*)

---

[3] Doc. 34 is Defendant's Motion for Summary Judgment, Doc. 35 is Defendant's Statement of Facts, and Doc. 38 is the Defendant's Notice of Filing and Service of Non-Electronic Exhibits, i.e., a CD containing the Jail's video footage of the incident. Plaintiff did not submit any exhibits with his Response and Defendant's Exhibits 4 and 6 are cover pages to the video CD. Thus, it is unclear what in Docs 34, 35, and 38 supports Plaintiff's position or how Defendant's Exhibits 4 and 6 support Plaintiff's position.

At Plaintiff's deposition, Plaintiff and counsel reviewed the Jail's video footage of the incident. At timestamp 22:33 on the video, Plaintiff is seen standing in the doorway of his cell, and counsel asked Plaintiff the following about that moment:

> Q [by counsel]: Okay. And this is the point for sure—at this point you're hearing that you—everyone needs to lock down?
>
> A [Plaintiff]: Yes.
>
> Q: You know at this point that you need to be in your cell with the door closed and locked; correct?
>
> A: Yes.
>
> Q: Okay. At 22:36 [on the video recording], a couple seconds later, few seconds later, up until this point have you been impacted by the pepper ball?
>
> A: No.
>
> Q: No. Okay. Up until this point your door—you are inside of your cell, but the door is still open; correct?
>
> A: Correct.
>
> . . . .
>
> Q: Okay. And so the only people at this point who aren't locked down are Ping, you, and Garcia and [Carter]? . . . . Is that right?
>
> A: Yes.
>
> . . . .
>
> Q: Okay. And at this point, 22:41, you are facing Commander Suffle; correct?
>
> A: Yes.
>
> Q: At this point you—you—well, you said you had already heard him tell you to lock down, but had you seen the pepper ball launcher in his hand as well?
>
> A. Yes.
>
> Q: Was he also yelling or was anybody, yelling that force was going to be used if did you didn't lock down?

> A: I don't recall it. I just remember him coming in and start saying "lock down."
>
> . . . .
>
> Q: . . . . So I guess my question is then that you're in the point of where you're closing your door because you were absolutely aware of the fact that if you don't lock down, there's a chance that there's going to be use of force taken against you?
>
> A: Well, see, from what I believe, I thought that the use of force was if there was a potentially violent situation or, you know, a threat to the safety of anybody, you know . . . . Clearly, there's no threat to nobody's safety right there. We're wondering what Commander is up to, you know. Would he have used it on me? I didn't think so. I didn't think so.
>
> Q: Okay. So in your mind at that point in time you knew that you were being commanded to lock down though; right?
>
> A: Yes.
>
> Q: Okay. And you knew that there had been a disturbance in your pod; correct?
>
> A: Yes.
>
> Q: Okay. And you knew that Commander Suffle came into the cell and he was carrying some sort of a weapon of some sort?
>
> A: Correct.

(Doc. 35-1 at 23-23 (Pl. Dep. taken at 77:21 through 81:1).)[4]

Plaintiff stated at his deposition that he saw the first PepperBall discharged to the upper deck sometime before timestamp 22:39 and, at that time, Plaintiff's cell door was still open. (*Id*. at 24 (Pl. Dep. at 81: 12-18; 82:10-11).) Plaintiff then agrees that the next PepperBall was launched at timestamp 22:47 and that is the first time a projectile was launched towards him, but he does not believe he was hit by it. (*Id*. (Pl. Dep. at 83:11-23).) Plaintiff testified:

> A: So at this point we're telling commander, that's not necessary. I mean, clearly we could hear Ping yelling that

---

[4] The video footage does not contain any audio.

- 9 -

his door was locked, and then we see Commander raise the gun at him, you know, so we're trying to calm him down at this point. "You don't need to do that. Talk to Garcia, that's it." That's what we were trying to tell him.

Q: So instead of quickly locking the door and securing yourself in, you're saying you took the opportunity to tell Commander Suffle that he didn't need to be doing what he was doing instead of locking down.

A: We were pointing it out that he didn't—force wasn't necessary, as there was no threat, you know.

Q: Instead of locking down, that's what you did; right?

A: Yeah.

Q: Okay. Did you see another discharge there?

A: Yes, I did.

Q: Okay. That was at 22:48?

A: Yes.

. . . .

Q: Okay. That's the point where you feel that that's where the impact occurred?

A: Yes.

Q: Okay. And you said it was your left foot?

A: Yes.

Q: Okay. So tell me what—so even after being told to lockdown, even after seeing Commander Suffle with the pepper ball launcher, and even after at least three rounds had been launched, you still had not locked yourself inside the cell, had you?

A: I was inside my cell, you know.

Q: But you hadn't locked down in your cell, had you?

A: Was the door secured? No, the door was not secured.

1 (*Id*. at 24-26 (Pl. Dep. at 83:25-84:18; 90:14-91:9).)

**IV. Discussion**

    **A. Evidentiary Issues**

Because Plaintiff failed to file a proper controverting statement of facts or produce any supporting evidence, Defendant asks that the Court deem his facts as admitted. (Doc. 41 at 2.) The Court declines to do so and will instead construe Plaintiff's verified Complaint as an affidavit in opposition to the summary judgment motion to the extent that statements are based on Plaintiff's personal knowledge. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (allegations in a pro se plaintiff's verified pleadings must be considered as evidence in opposition to summary judgment); *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (verified complaint may be used as an affidavit opposing summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence). To the extent Plaintiff failed to controvert Defendant's facts in his Complaint, the Court will assume those facts are uncontroverted for the purposes of this Order. *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013) (If a summary judgment motion is unopposed, Rule 56 "authorizes the court to consider a fact as undisputed.").

Ordinarily, where the parties' versions of events differ, the Court takes the non-moving party's facts as true. *See Anderson*, 477 U.S. at 255. The Supreme Court has held, however, that when opposing parties tell two different stories, "one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" in ruling on summary judgment. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape").

Although Plaintiff alleges in his Complaint that Defendant entered the dayroom, started firing PepperBalls at everyone, and then gave the order to lock down, the video evidence, which Plaintiff confirmed at his deposition, shows different events. In the first of two videos, which shows the area at the front of the pod and the day room door, Garcia is seen at the window next to the door pacing, gesticulating, stamping his foot, and hitting

1    the windows with his fists and head, and at times he appears to be talking to someone.  This
2    all takes places over an approximate 16-minute period.  Defendant enters the day room
3    around timestamp 22:26.  On the second video, which shows part of the dayroom and the
4    cell fronts, detainees are seen heading to their cells around timestamp 22:00, before
5    Defendant enters the dayroom.  At 22:29, Garcia and Plaintiff's cell doors are open and
6    Garcia hands something to Plaintiff.  At 22:33, Defendant and an officer come into view
7    and Plaintiff and Garcia's cell doors are still open.  At 22:33, Defendant aims the
8    PepperBall launcher at the upper tier and appears to shoot a PepperBall.  Plaintiff's and
9    Garcia's cell doors are still open and they are standing in the doorways looking in the
10   direction of Defendant.  Between 22:33 and 22:42, Defendant and the other officer are
11   walking toward Plaintiff's cell with the launcher in plain view and occasionally raised.
12   Plaintiff's cell door is still not closed, and at 22:46 Defendant appears to fire two more
13   PepperBalls at the floor outside Plaintiff's door.  Plaintiff's cell door appears to close
14   completely at 22:52.

**B.** ***Kingsley*** **Factors**

**1.    Relationship Between Need for Force and Amount of Force Used**

The evidence shows that Garcia was creating a disturbance for over 15 minutes, that Garcia and the rest of the detainees were ordered to lockdown, and that most of the detainees locked down as ordered.  When Defendant entered the dayroom with the PepperBall launcher, however, neither Garcia nor Plaintiff complied with the orders to lockdown.  Plaintiff admits as much in his deposition testimony.  Thus, a finder of fact could reasonably infer that force was needed to restore discipline in the pod.  Courts have found that the use of pepper spray is justified in such situations.  *See, e.g., Uerling v. Piccinini*, No. C 98-3790 CRB (PR), 1999 WL 225981, at *2 (N.D. Cal. April 12, 1999) (granting summary judgment to defendants where pretrial detainee alleged Fourteenth Amendment violation because officers used pepper spray and other force after detainee did not comply with handcuffing orders), affirmed in *Uerling v. Piccinini*, 238 F.3d 433 (9th Cir. 2000) (unpublished); *Farmer v. Plummer*, No. C-94-0958 CAL, 1995 WL 271261, at

*2 (N.D. Cal. May 1, 1995) (granting summary judgment to defendants where defendants used pepper spray on pretrial detainee after detainee threatened to strike defendants with his crutch, finding that defendants only used as much force as necessary to subdue the detainee); *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979) (finding in the Eighth Amendment context that the use of tear gas in small amounts "may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required. In these circumstances the substance may be a legitimate means for preventing small disturbances from becoming dangerous to other inmates or the prison personnel."); *Carr v. Beth*, 465 F. App'x, 567, 571 (7th Cir. 2012) (finding that guards' use of pepper was necessary to restore discipline when pre-trial detainee refused orders to relinquish a pen or return to his cell and subsequently refused to open his cell door); *Sanchez v. McCray*, 349 F. App'x 479, 483 (11th Cir. 2009) (use of pepper spray to subdue pre-trial detainee who refused to comply with orders was not excessive force).

This factor weighs in favor of Defendant.

### 2. Extent of Plaintiff's Injury

Defendant argues that the extent of Plaintiff's injury is de minimis and that the video footage shows that Plaintiff was never struck on the foot by a PepperBall. (Doc. 34 at 10.) Given the distance of the camera from Plaintiff, it is not possible for the Court to determine whether a PepperBall struck Plaintiff or the floor in front of Plaintiff's cell. Nevertheless, it appears that Plaintiff is not complaining that he suffered an injury from the PepperBall striking his foot, but that his injury was from the chemicals used in the PepperBalls.

Plaintiff does not submit any evidence of his injuries, that he requested any medical attention for his alleged injuries, or that he requested assistance in decontaminating himself or his cell after the PepperBalls were fired in his direction. Plaintiff's Complaint allegations that he suffered PTSD, anxiety, stress, tension, night terrors, anger, frustration, paranoia, schizophrenia, depression, suicidal thoughts, fear of further abuse, pain, suffering, and trust issues are unsupported by any medical evidence. While Plaintiff may

attest to such problems as anxiety, tension, anger, and frustration, he has not presented any specific evidence of how these problems were manifested. Nor has he presented any evidence showing that he is competent to diagnose conditions such as PTSD, depression, or schizophrenia. As such, Plaintiff's Complaint allegations of his injuries are too vague and conclusory to defeat summary judgment. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment").

This factor weighs in favor of Defendant.

### 3. Effort Made to Temper or Limit the Amount of Force

Although Plaintiff alleges in his Complaint that Defendant entered the pod and immediately started shooting PepperBalls before issuing any lockdown orders, the video shows that Defendant entered the pod at timestamp 22:26, discharged the first PepperBall to the upper level at 22:33, and then fired two PepperBall rounds toward Plaintiff at 22:46. Plaintiff admitted at his deposition that he saw Defendant with the PepperBall launcher, saw Defendant fire the first round toward the upper level, and that he heard the order for everyone to lockdown, but instead argued with Defendant about the need for force.

This evidence shows that Defendant made an effort to temper or limit the amount of force.

### 4. Severity of Security Problem and Threat Reasonably Perceived

Defendant has presented evidence, and Plaintiff admits, that Garcia was causing a disturbance in the pod for at least 15 minutes. The evidence further supports that Jail staff ordered the entire pod to lock down, but four detainees, including Plaintiff, did not do so. Even after Defendant fired a PepperBall at the upper tier, Plaintiff did not comply with the lockdown order and argued with Defendant about the necessity of using force. Thus, a reasonable officer would view the situation as escalating, and a reasonable officer in Defendant's position could view Plaintiff's obstinance as a threat to the safety of Jail staff and other detainees.

### 5. Whether Plaintiff was Actively Resisting

Plaintiff admits that he knew he was supposed to lockdown and saw the PepperBall launcher, but still did not comply with the lockdown order and argued with Defendant about the need for force. Plaintiff was actively resisting Defendant's efforts to restore order in the pod. This factor supports Defendant.

The totality of the *Kingsley* factors supports that the use of force was objectively reasonable in this case. The Court will grant summary judgment to Defendant.[5]

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 34).

(2) Defendants' Motion for Summary Judgment (Doc. 34) is **granted**, and the action is terminated with prejudice. The Clerk of Court will enter judgment accordingly.

Dated this 1st day of August, 2019.

*David G. Campbell*

David G. Campbell
Senior United States District Judge

---

[5] Because the Court is granting summary judgment to Defendant on the merits of Plaintiff's claim, the Court need not reach Defendant's alternative argument that he is entitled to qualified immunity.